Argued and submitted February 2, affirmed September 27, 2023, petition for review denied February 1, 2024 (372 Or 26)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRIAN JAMES McINTIRE,
*Defendant-Appellant.*

Linn County Circuit Court
19CR48522; A175345

537 P3d 608

Defendant appeals from a judgment of conviction for two counts of manslaughter, fourth-degree assault, and driving under the influence of intoxicants (DUII). He assigns error to (1) the trial court's denial of his motion *in limine* to exclude the results of the field sobriety horizontal gaze nystagmus test; and (2) the trial court's denial of his motion to suppress evidence of his blood-alcohol content obtained through an unwarranted forensic blood draw. *Held*: The Court of Appeals rejected defendant's first assignment of error as unpreserved. It rejected the second assignment of error because the warrantless forensic blood draw was justified by exigent circumstances, and the exigency was not eliminated by a medical blood draw being performed at the same time.

Affirmed.

Thomas McHill, Judge. (Judgment entered January 19, 2021; Supplemental Judgment entered April 16, 2021)

Brendan J. Kane, Judge. (Order entered May 4, 2021)

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagan, Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

Defendant appeals from a judgment of conviction for first-degree manslaughter, ORS 163.118 (Counts 1 and 2); fourth-degree assault, ORS 163.160 (Count 4); and driving under the influence of intoxicants (DUII), ORS 813.010 (Count 5).[1] On appeal, defendant raises two assignments of error. His first assignment challenges the trial court's denial of his motion *in limine* to exclude the results of horizontal gaze nystagmus (HGN) test. We conclude that defendant's argument is not preserved. Because defendant does not request plain-error review, we do not consider whether the requisites of plain-error review are satisfied or otherwise engage in that review. In his second assignment of error, defendant challenges the trial court's denial of his motion to suppress evidence of his blood-alcohol content (BAC) obtained through an unwarranted forensic blood draw. We conclude that the trial court did not err in determining that the warrantless search and seizure of defendant's blood was justified by exigent circumstances. We affirm.

## FACTS

On the evening of July 23, 2019, defendant was involved in a motor vehicle crash that resulted in the deaths of two people. Evidence presented at trial showed that defendant had consumed five 14-ounce beers during the four hours before the crash. Sheriff Deputy Brent Hauke administered field sobriety testing at the site of the crash, including the HGN test, which involves moving a stimulus horizontally while watching for involuntary jerking of the individual's eyes. Hauke observed six out of six signs of impairment on the HGN test.

Defendant was subsequently arrested and transported to the hospital. At that point, defendant declined to consent to testing of his blood or urine, and Hauke decided to perform a forensic blood draw based on exigent circumstances. A hospital phlebotomist was preparing to perform a medical blood draw and agreed to perform both the medical and forensic draws at the same time in order to avoid

---

[1] Defendant was acquitted of a second charge of fourth-degree assault (Count 3).

having to draw blood more than once. Hauke provided the phlebotomist with a forensic kit, and she drew several vials of blood for both medical and forensic purposes. Several hours later, more than six hours after the crash, investigators had obtained a warrant for another blood draw and drew another sample.

Each of the samples returned different results. Testing by the Oregon State Police crime lab of the forensic vial revealed a BAC of 0.058. The medical vial revealed a BAC of 0.073 when tested by the hospital on the night of the accident and 0.039 when tested weeks later by the crime lab. The blood sample taken pursuant to the warrant showed a BAC of zero. An expert medical witness testified that the variations in the results from the medical and forensic draws, despite being taken from defendant at the same time, were due to the parts of the blood tested and the lack of preservatives in the medical vial which led to the evaporation of alcohol from the medical sample over the intervening weeks. The same expert testified that, based on all of the evidence available to him, he estimated defendant's BAC at the time of the accident to be between 0.091 and 0.139.

The jury found defendant guilty of manslaughter, assault, and DUII. This appeal followed.

## HGN EVIDENCE

In his first assignment of error, defendant challenges the trial court's denial of his motion to exclude evidence of the results of the HGN testing performed shortly after the accident. He asserts that the state failed to meet its burden to establish the scientific validity of the administration of the test, and thus the trial court erred in admitting the test results as scientific evidence. The state argues that defendant failed to preserve the particular argument he raises on appeal and, in any event, the trial court did not err. Alternatively, the state argues that any error was harmless. We conclude that defendant did not adequately preserve the issue for our review.

"No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court[.]" ORAP 5.45(1). "[A] party must provide the trial

court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately[.]" *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). The policy reasons favoring preservation are prudential in nature: it "gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal"; it also "ensures fairness to an opposing party," and "fosters full development of the record[.]" *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008).

Defendant's assignment of error arises out of the court's denial of his motion to exclude the results of the HGN test. In his initial written motion to the trial court, defendant argued that the HGN test results could not be admitted as scientific evidence of the effects of alcohol because defendant had suffered a head injury in the accident. Arguing that head trauma can cause nystagmus independent of the influence of alcohol, defendant asserted that the state could not show that the results were scientifically relevant and reliable, and thus did not meet the foundational requirements of *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), to be admitted as scientific evidence.[2] In response, the state argued that the presence or absence of a head injury was a factual issue that must be argued to a factfinder and did not create a foundational issue that had to be disproved before the HGN test results were admissible. The state asserted that, under *O'Key*, it was merely required to establish that the officer who administered the test was qualified, that the test was properly administered, and the results were recorded accurately, all of which the state asserted it was prepared to show.

---

[2] In *O'Key*, the Supreme Court determined that HGN test evidence is scientific evidence. 321 Or at 297. Applying a multifactor test, the Supreme Court concluded that "the general proposition supporting HGN test evidence—that alcohol consumption causes nystagmus—is scientifically valid." *Id.* at 319. The Supreme Court held that "subject to a foundational showing that the officer who administered the test was properly qualified, the test was administered properly, and the test results were recorded accurately, HGN test evidence is admissible in a DUII proceeding to establish that a defendant was under the influence of intoxicating liquor[.]" *Id.* at 322-23.

A hearing was held on June 30, 2020, regarding the various evidentiary issues raised in defendant's motion. The state called Deputy Hauke and questioned him about his training and experience and how the HGN test is generally performed and what it shows. With respect to the day in question, Hauke testified that he administered the test consistent with his training and experience and that he had observed six out of six clues of impairment. The state then played the dash camera video of Hauke conducting the HGN test on defendant and, after confirming that Hauke had recently reviewed materials about how to perform the test, further questioned him:

"Q. Okay. And having reviewed the materials, could you spot any instance where you deviated from the course material or the training materials that you had provided?

"A. The only deviation that's possible is during the distinct and sustained nystagmus, they want you out for about four seconds, maybe I might have been just a little bit under at the maximum deviation, but—but other than that . . .

"Q. That notwithstanding, did you nevertheless observe nystagmus at maximum deviation?

"A. Yes, I did."

On cross-examination, defense counsel had the following exchange with Hauke:

"Q. So, you testified that you may have been not out quite long enough on the sustained—distinct and sustained nystagmus.

"A. On one of the passes through, yes.

"Q. So that test is—essentially what you're looking for is whether the nystagmus remains over a period of time, correct?

"A. Correct.

"Q. Because everybody has a little bit of nystagmus when their eyes first get out to maximum deviation, correct?

"A. I don't think so.

"Q. So in—

"A.   I don't know if everybody does.

"Q.   But it's common?

"A.   I don't know.

"Q.   And that's not something that you remember from your training?

"A.   That it's common? No."

Counsel then moved on to other topics, including defendant's head injury and emergency lights that were in the area that could have impacted defendant's eyes.

In concluding arguments to the court, the state asserted that it had met its foundational burden under *O'Key*, because Hauke testified about his qualifications and experience, that he administered the test properly, and that he recorded the results accurately. In arguing that the test was properly conducted, the state argued:

> "The only thing he said, that he admitted, was that he may have gone under four seconds at maximum deviation. I would argue that that does—that that does not invalidate the HGN results, particularly since he observed nystagmus prior—I mean he observed nystagmus prior to onset and that he continued to observe it at maximum deviation.
>
> "And I'd ask maybe you review the video. From my perspective it looked like he held it there for a long time, but it's hard to tell from the angle. But you can—you can see that he did—it wasn't a cursory holding out there, it was—it was for a few seconds.
>
> "And so he did administer the test properly."

Defense counsel argued that the foundational requirements were not met due to Hauke's lack of recall about his training and errors in the administration of the test, specifically the presence of flashing lights and the angle and distance at which Hauke held the stimulus. In sum, defense counsel stated:

> "[I]t is clear, Judge, that at least important parts of this test were not administered per the training, and it's even questionable that Deputy Hauke remembered all—all these parts. There's so much that he says he didn't remember and there's really a lack of evidence that he was properly—or

that he was trained according to what the Administrative Rules require."

In a written opinion, the court denied defendant's motion to exclude the HGN evidence. Noting that Hauke's qualification to perform the test was the primary issue raised by defendant, the court concluded that Hauke had received the proper training. The court further noted that there was no evidence that the test results were not accurately recorded and that Hauke had testified that he performed the test consistently with his training. The court also acknowledged that it had reviewed the various recordings of the incident. Finally, the court stated that defendant had denied any symptoms of a brain injury at the time of the testing and there was no evidence in the record that he had suffered a concussion. For those reasons, the court denied the motion to exclude the HGN results. The court did not mention or resolve any issues regarding lights, the positioning of the stimulus, or the duration for which the officer held the stimulus at maximum deviation.

In his briefing before us, defendant's challenge focuses entirely on the requirement that the stimulus be held for four seconds at maximum deviation. Based on Hauke's testimony that "maybe I might have been just a little bit under at the maximum deviation" on one of the passes, defendant asserts that the state failed to present any evidence to support an inference that Hauke administered the test correctly. Defendant argues that the state did not meet its burden to prove that the results were scientifically valid, and the HGN evidence was therefore not admissible. Defendant maintains that the issue is preserved because he argued below that Hauke did not administer the test according to his training, and the state specifically addressed maximum deviation in its argument.

The state argues that the issue was not properly preserved. It notes that defendant raised other objections to the foundation for the evidence, including the lights, the positioning of the stimulus, defendant's head injury, and the officer's training, but did not contend that the test was performed incorrectly due to the length of time that Hauke held the stimulus at maximum deviation. The state emphasizes

that defendant argued his interpretation of the evidence, urging the court to find that the test was not performed correctly as a factual matter, but notes that he never asserted that the evidence was legally insufficient to support a finding that the test was performed correctly.

We agree with the state that defendant failed to preserve the argument he now raises. Despite making arguments below regarding how the trial court should view the evidence and what factual conclusions it should draw, defendant never raised an argument that the test results were unreliable as a matter of law based on the officer's failure to hold the stimulus for the full four seconds at maximum deviation. Defendant never maintained that the HGN evidence was inadmissible or lacked a sufficient foundation because there was no evidence that the officer held the stimulus for a sufficient amount of time.

"[T]here is a critical difference * * * between arguing to the trial court as factfinder that it should be *persuaded* to decide the case in a particular way and arguing to the trial court as legal decisionmaker that only one outcome is permitted *as a matter of law*." *State v. M. D. M.*, 320 Or App 394, 396, 513 P3d 622 (2022) (emphases in original). Had defendant raised that argument below, the state would have had the opportunity to meet the argument and respond to it, potentially developing the record differently, and the trial court would have had the opportunity to make specific findings and resolve the matter in the first instance. *See Peeples*, 345 Or at 219-20 (discussing the underlying policies of preservation rules, including fairness and efficiency). The claim of error raised on appeal is unpreserved, and we reject it on that basis.

When an issue was not preserved in the trial court, we have discretion to consider a claim of plain error. ORAP 5.45(1). "However, we ordinarily will not proceed to the question of plain error unless an appellant has explicitly asked us to do so," as "it is incumbent upon the appellant to explain to us why an error satisfies the requisites of plain error and, further, why we should exercise our discretion to correct that error." *State v. Ardizzone*, 270 Or App 666, 673, 349 P3d 597, *rev den*, 358 Or 145 (2015) (internal quotation marks omitted). Defendant does not request plain-error

review in this case, and we therefore do not undertake that analysis.

## WARRANTLESS BLOOD DRAW

In his second assignment of error, defendant challenges the court's denial of his motion to suppress the results of the forensic blood draw. As noted above, after defendant was transported to the hospital, a phlebotomist drew multiple vials of blood, some for medical purposes and some for forensic purposes. In a pretrial motion, defendant argued that the forensic draw, which was performed without a warrant, was an unlawful search and seizure under Article I, section 9, of the Oregon Constitution. The trial court concluded that the state had met its burden of demonstrating exigent circumstances to permit the warrantless blood draw.

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Middleton*, 294 Or App 596, 597, 432 P3d 337 (2018). We are bound by the trial court's findings of fact if they are supported by evidence in the record. *Id.*

It is well-established that a forensic blood draw is governed by search and seizure principles. *State v. Kelly*, 305 Or App 493, 496, 469 P3d 851 (2020). A warrantless search or seizure is *per se* unreasonable unless it falls under an exception to the warrant requirement, such as exigent circumstances. *Id.* Ordinarily, a warrantless blood draw is permitted when an individual has been legally seized for DUII, due to the exigent circumstances of dissipation of alcohol from the human body. *Id.* at 497. However, we have recognized that, in some rare circumstances, that exigency will not be present, and the state bears the burden of proving that an exigency existed. *Id.* at 498-99.

In order to meet its burden of establishing that a blood draw was justified by exigent circumstances, the state must demonstrate that an officer's subjective belief—that exigent circumstances existed and thus the forensic draw was needed to adequately preserve evidence of BAC—was objectively reasonable based on the officer's "contemporaneous perspective based on information known or reasonably

discernible in the totality of the circumstances[.]" *State v. Martinez-Alvarez*, 245 Or App 369, 376, 263 P3d 1091 (2011).

While defendant's pretrial motions were pending, we decided *Kelly*, which involved an investigator obtaining a forensic blood sample when a medical blood draw and testing had already been performed. 305 Or App at 495. In that case, the hospital had already drawn the defendant's blood and performed blood-alcohol analysis on it and informed the investigating officer that BAC results were available. *Id.* The officer asked the hospital staff not to tell him the results, and requested a forensic draw be performed. *Id.* The officer testified at a pretrial hearing that he did not attempt to get a warrant first because it would have taken several hours. *Id.* He subsequently obtained a warrant to have the blood tested. *Id.* The defendant challenged the admissibility of the forensic draw, and we concluded that the state had not met its burden to establish that a second blood draw was justified by exigent circumstances. *Id.* at 501. Though the state argued on appeal that medical and forensic draws have different levels of reliability and evidentiary value, we noted that the state did not offer evidence before the trial court on those issues. The record contained no evidence that an objectively reasonable officer in that investigator's position would have been concerned that the medical blood draw or test results, which were available in the moment, would not be reliable or available as evidence at trial and the state did not offer evidence of any evidentiary problems with a medical draw, such as how the draws might differ scientifically or any issues with foundation for the medical draw. *Id.* at 501.

In the present matter, the trial court found that this case was factually distinguishable from *Kelly* in some important ways, particularly with respect to the development of the record as to the officer's subjective reasoning in seeking the forensic sample and the objective differences in testing, preservation, and handling of the samples for medical versus forensic purposes. The court concluded that the state had satisfied its burden of proving that an exigency existed.

On appeal, defendant argues that exigent circumstances did not justify the warrantless forensic blood draw. Analogizing to *Kelly*, he asserts that the medical draw would have been sufficient to preserve the BAC evidence and that the state failed to meet its burden to show that the officer reasonably believed that the medical draw would not be reliable or admissible.[3] The state argues that this case is distinguishable from *Kelly*, both factually and in terms of record development, and that the trial court therefore did not err in concluding that the circumstances did not warrant suppression.

We conclude that the trial court did not err by denying defendant's motion to suppress. As noted above, we review the trial court's denial of the motion to suppress for errors of law, but we are bound by the trial court's findings of fact if they are supported by evidence in the record. *Middleton*, 294 Or App at 597. The trial court made factual findings regarding the officer's reasons for believing that the exigent draw was required as opposed to relying on the hospital draw, including concerns about chain of custody, protocols for preservation, and security of the samples; assurances that the proper testing would be done on the forensic samples and lack of knowledge about what testing would be performed on the medical samples; knowledge that the forensic draw would be performed following a swab of defendant's arm with iodine rather than alcohol; knowledge about what preservatives or other additives would be included in the forensic samples; and the importance of preservation of forensic samples for the possibility of replication of testing if needed. The court further noted that at the time the forensic draw was performed, no testing had been done on the medical samples, unlike in *Kelly*. Additionally, a forensic expert testified that the variation in results from the crime lab's testing of the leftover medical sample when compared to the hospital's testing of the same sample was due to the lack of preservatives in the vial.

---

[3] We understand defendant to contend that the state failed to meet its burden to prove exigent circumstances because the state failed to demonstrate that the medical blood draw was insufficient and a separate warrantless forensic blood draw was therefore needed. We do not understand defendant to contend that the state could have obtained a warrant for a blood draw in time to obviate the exigent circumstances due to the dissipating BAC in defendant's blood.

All of the trial court's factual findings are supported by evidence in the record. The facts developed at multiple hearings demonstrate that the officer's subjective belief that a forensic draw was needed to adequately preserve the BAC evidence was objectively reasonable, in light of the totality of the circumstances. Therefore, the state met its burden of demonstrating that exigent circumstances existed to justify the warrantless blood draw. The trial court did not err in denying defendant's motion to suppress.

Affirmed.